IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| LONGHORN HD LLC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:20-CV-00349-JRG-RSP |
| | § | |
| NETSCOUT SYSTEMS, INC., | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION**

Before the Court is the Motion to Exclude Portions of Mr. Jim Bergman's Reasonable Royalty Calculation and Opinions Regarding Damages, filed by Defendant NetScout Systems, Inc., Dkt. No. 71. The Motion is **DENIED**.

**I.   BACKGROUND**

On November 5, 2020, Plaintiff Longhorn HD, LLC. filed the present suit alleging that several of Defendant's network security products infringe its patents. Dkt. No. 1. Plaintiff designated Mr. Jim W. Bergman as its damages expert in this matter. Dkt. No. 71 at 7.[1]

On December 18, 2021, Plaintiff served Mr. Bergman's corrected damages report. *See id*. Defendant now moves to exclude certain portions of Mr. Bergman's corrected report.

**II.   LEGAL STANDARD**

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

---

[1] Citations are to document numbers and citation numbers assigned through ECF.

of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while

2

exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

### III.   ANALYSIS

Defendant moves to exclude certain opinions of Mr. Bergman's report because he allegedly: (1) used an incorrect hypothetical negotiation date, (2) implemented an unreliable method of determining a running royalty profit split, (3) applied an unreliable method of apportionment, and (4) improperly considered maintenance revenues for his royalty base calculation.

#### A.   Mr. Bergman's Hypothetical Negotiation

Defendant argues that Mr. Bergman's reasonable royalty calculation is fatally flawed because he chose an inappropriate hypothetical negotiation date, which caused incorrect parties to appear at the hypothetical negotiation table. *See* Dkt. No. 71 at 10–13. Mr. Bergman chose a hypothetical negotiation date of July 14, 2015. Dkt. No. 71-1 ¶ 27. Mr. Bergman chose this date based on when the Defendant allegedly began infringing (i.e. when Defendant acquired Arbor Networks).[2] *See id.*

##### 1.   Hypothetical Negotiation Date

Defendant alleges Mr. Bergman's reasonable royalty opinions are "unreliable and legally erroneous" because Mr. Bergman's selected date is inconsistent with Federal Circuit precedent.

---

[2] On July 14, 2015, Defendant acquired Arbor Networks. Dkt. No. 71-1 ¶ 27. Prior to being purchased by Defendant, a different organization sold the accused products.

3

*See* Dkt. No. 71 at 12 (citing *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012)). Defendant argues that according to *LaserDynamics*, among other decisions, the date of the hypothetical negotiation is the "date of first infringement" irrespective of who the negotiating party may be. *See id.* (citing 435 F.3d at 1361). Defendant states Mr. Bergman's July 2015 date is not "the date of first infringement," but rather Mr. Bergman incorrectly selected the date Defendant acquired Arbor Networks. Defendant argues that the correct hypothetical negotiation date, at least for the TMS and Sightline products, is the date when Pat. No. 7,260,846 issued (August 21, 2007). *See id.* at 13 n.3. Defendant also argues that according to *Implicit*, the hypothetical negotiation date should at least be before July 2015. *See id.* at 11 (citing *Implicit LLC v. NetScout Systems, Inc.*, Case No. 2:18-cv-00053-JRG, Dkt. No. 209 at 1-2 (E.D. Tex. Nov. 21, 2019)).

Plaintiff responds that Defendant is attempting "to back-date the proper hypothetical negotiation date by claiming that certain of the Accused Products were available prior to the hypothetical negotiation . . . ." Dkt. No. 82 at 6. Plaintiff states it "is not claiming liability dated prior to the NetScout-Arbor acquisition, and there is no expert opinion in the record that the Accused Products were infringing prior to the hypothetical negotiation date. A dispute among the experts is not grounds for exclusion." *Id.* at 7.

Mr. Bergman's hypothetical negotiation date is not erroneous. At bottom, Defendant's argument is premised on the assertion that the party representing the alleged "infringer" at the hypothetical negotiation table could be a party other than the defendant(s) to the suit. *See* Dkt. No. 71 at 12 (citing *LaserDynamics*, 694 F.3d at 75). None of the cited cases support Defendant's position.

For example, in *LaserDynamics* the Federal Circuit explained that although the Defendant only became liable for active inducement of infringement in 2006, the correct date of hypothetical negotiation was 2003—the date "the underlying direct infringement" began. *See LaserDynamics*, 694 F.3d at 75-76. The defendant in *LaserDyanmics* was the same in both 2006 and 2003, unlike the present situation. As for *Implicit*, plaintiff was seeking damages back to April 2014, when a different organization was selling the accused devices. Thus, the hypothetical negation date was set for April 2014, when that other entity was selling the allegedly infringing devices. Here, Plaintiff only seeks damages starting from July 2015—the date Defendant started the allegedly infringing behavior. So, *Implicit* does not provide guidance either. Defendant's other cited precedents are distinguishable for similar reasons. Indeed, the hypothetical negotiation is "between the patentee *and infringer* (both hypothetically willing) at the time infringement began." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) (emphasis added). Here, Defendant is the alleged "infringer," and it began to allegedly infringe upon acquisition of Arbor Networks which took place on July 14, 2015. The Court holds the date of Defendant's first infringement is July 14, 2015.[3]

### 2.     Parties at the Hypothetical Negotiation Table

Since July 14, 2015 is the applicable hypothetical negotiation date, Plaintiff has placed the correct parties at the hypothetical negotiation table.

---

[3] If Defendant's argument that negotiating party representing the "infringer" is untethered from the alleged infringer (i.e. the Defendant(s)) in the suit is correct, then unusual results would ensue. Indeed, the Court can envision many scenarios where the hypothetical negotiation would occur between parties not associated with the litigation or would have several different parties at the hypothetical negotiation table representing the "infringer." In other words, situations would arise when a hypothetical negotiation would occur when both the plaintiff-in-suit and defendant-in-suit are not at the hypothetical negotiation table. The Court is aware precedents where the potential "licensor" was a different party than the Plaintiff. *See e.g. Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1116 (N.D. Cal. July 22, 2011) (Plaintiff was not the correct party at the hypothetical negotiation). But the Court is unaware of, nor have the parties presented, any precedent where the damages period is limited to when the defendant was allegedly infringing but defendant was not considered the "infringer" at the time of first infringement.

### B.     Mr. Bergman's Profit Split Analysis

Defendant argues that Mr. Bergman's method of determining the profit split between the negotiating parties "is nothing more than an arbitrary rule of thumb that lacks any reliable 'fit' to the facts of this case." Dkt. No. 71 at 15. Defendant contends that Mr. Bergman has no evidence to support his opinion and it should be stuck as arbitrary. *See id*. at 17.

Plaintiff responds that "Mr. Bergman conducted a detailed analysis" and considered several factors when rendering his opinion. *See* Dkt. No. 82 at 8. Plaintiff states "the differences in analysis between Mr. Bergman and NetScout's expert are fodder for cross-examination and the jury's credibility determinations . . . ." *Id*.

The Court agrees with Plaintiff. Mr. Bergman considered several factors when rendering his profit-split opinions. For example, Mr. Bergman discusses historical trends in each party's licensing practices (including historical profit-split percentages) as well as the impact the *Georgia-Pacific* factors have on the profit split. *See* Dkt. No. 71-1 ¶¶ 242–256. Although Defendant disagrees with the conclusions of Mr. Bergman's analysis, those arguments go to the weight and credibility of Mr. Bergman's opinions, not their admissibility.

### C.     Mr. Bergman's Apportionment Analysis

Defendant states that Mr. Bergman's 50% apportionment opinion should be struck because he "arbitrarily opined that 50% of the value of the Accused Products should be apportioned to the product's ability to detect." Dkt. No. 71 at 18. Defendant argues that "Mr. Bergman cannot simply rely on the technical value Dr. Kia ascribes to the infringing features of the Accused Products . . . in determining a proper apportionment value." *Id*. at 19.

Plaintiff counters that Mr. Bergman's analysis of the "50/50 technical split and the determination of the value attributable to that technical contribution are reliably analyzed and

6

calculated and should not be excluded." Dkt. No. 82 at 9. Plaintiff asserts that since "Mr. Bergman relied on Dr. Kia for the 50/50 technical apportionment, as he is permitted to do, … any issues regarding this analysis should be directed at Dr. Kia." *Id*.

Mr. Bergman may rely on Dr. Kia's opinion about the technical importance of the patent-in-suit to support Mr. Bergman's apportionment analysis. *See Personalized Media Communs., LLC v. Apple, Inc.*, No. 2:15-cv-01366-JRG-RSP, 2021 U.S. Dist. LEXIS 31667, *10 (E.D. Tex. Feb. 19, 2021) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.")). Defendant's argument that Mr. Bergman arbitrarily opined on the 50% apportionment is misplaced. Plaintiff's experts discussed apportionment during their November 12 and November 15 discussions. *See* Dkt. No. 71-1 ¶ 147. Dr. Kia expressed that "the ability to detect without mitigation and the ability to mitigate without detection are equally unhelpful to organizations during a volumetric attack." *Id*. Defendant can, and did, depose Dr. Kia at which time Defendant had the opportunity to probe the content and substance of his conversation with Mr. Bergman. Mr. Bergman is certainly entitled to rely on Dr. Kia's opinion regarding the importance of the detection function in network security systems. *See Apple*, 757 F.3d at 1321 (citing *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 609-613 (7th Cir. 2002) ("it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.")). In view of Dr. Kia's opinion that detection is *equally* important as mitigation, it is not unreliable for Mr. Bergman to have apportioned 50%. To the extent that Defendant argues about the reliability and methodology of Dr. Kia's analysis, that is best handled in a motion related to Dr. Kia not Mr. Bergman.

### D. Mr. Bergman's Royalty Base and Convoyed Sales Analysis

Defendant argues that Mr. Bergman's royalty base opinion should be excluded because it impermissibly includes maintenance revenues associated with the accused products. Dkt. No. 71 at 19. Defendant states that for maintenance revenues to be part of the royalty base there must be opinions that the patented invention meets the entire market value rule for the accused products. *See id*. at 20 ("Thus, to present a legally submissible opinion regarding convoyed maintenance revenue, Mr. Bergman must show that the entire market value rule is satisfied, such that the patented feature constitutes the sole basis for consumer demand for the non-infringing maintenance."). Defendant contends that since Mr. Bergman did not submit an entire market value opinion than the maintenance revenues cannot be considered as part of the royalty base during the hypothetical negotiation. *See id*. at 20–21.

Plaintiff responds that Mr. Bergman can consider convoyed maintenance revenues as part of the royalty base without an opinion on whether the claimed invention constitutes the sole basis for consumer demand for maintenance services. *See* Dkt. No. 82 at 10–11 (citing *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)). Plaintiff argues that due to the "close functional relationship between NetScout's product revenue and its maintenance revenue" that the hypothetically negotiating parties "would consider the revenue and profitability from maintenance in the determination of the reasonably royalty." *See* Dkt. No. 71-1 ¶¶ 114–16; *See also* Dkt. No. 82-3 at 4–7. In other words, Mr. Bergman opines that the parties would have considered maintenance revenues during the hypothetical negotiation because it is difficult to separate the sale of the allegedly infringing product from the follow-on sale of services (in this case maintenance services). *See* Dkt. No. 71-1 ¶¶ 114–16.

Mr. Bergman is permitted to opine on whether convoyed maintenance revenues would have been considered by the parties during the hypothetical negotiation. Although the maintenance revenues are not infringing that is no reason to exclude Mr. Bergman's opinion on whether the parties would have considered those sales during the hypothetical negotiation. *See Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1558-1559 (Fed. Cir. 1983) (citing *Union Carbide Corp. v. Graver Tank & Mfg. Co.*, 282 F.2d 653, 671-72 (7th Cir. 1960), *cert. denied*).

The cited portions of *Union Carbide*, which are relied upon in *Deere*, provide guidance on this issue. In *Union Carbide*, the court permitted the consideration of sales revenue for non-infringing equipment and machines, and the profit thereof, as part of the royalty analysis. *See Union Carbide Corp. v. Graver Tank & Mfg. Co.*, 282 F.2d 653, 671 (7th Cir. 1960) ("'The fact that Lincoln had such sales of supplies, equipment and machines and the extent thereof and the profit therefrom was given weight by me in arriving at the conclusion that in the hypothetical negotiation of a reasonable royalty the parties would have taken such facts into consideration and that Lincoln as a proposed licensee would be willing, if thought necessary and desirable, to charge part or all of the royalty agreed upon to other operations rather than include the royalty in the selling price of its 660 flux."). The *Union Carbide* court stated:

> It seems a logical and commonsense view that Lincoln, if it had been negotiating with Union Carbide for a license, would have taken into consideration all advantages which might accrue to it in determining a royalty which it would be willing to pay. A license to sell the patent flux would have enabled Lincoln to expand its business, increase its sales of non-infringing materials and thereby increase its profits.
>
> . . .
>
> as we have shown, the right to sell the patented flux in all probability would have resulted in an advantage in the sale of non-infringing materials and equipment to be used in connection therewith.

282 F.2d at 672.

Similarly, the Court finds there is sufficient evidence to suggest that selling the patented invention "in all probability would have resulted in an advantage in the sale of non-infringing materials." *Union Carbide Corp. v. Graver Tank & Mfg. Co.*, 282 F.2d 653, 672 (7th Cir. 1960); Dkt. No. 82-3 at 4–7. Thus, Mr. Bergman's sufficiently supported opinion that the parties would have considered convoyed maintenance revenues in the hypothetical negotiation is permissible and does not require Plaintiff to show that the patented invention satisfies the "entire market rule" before considering convoyed maintenance revenues.

### IV.   CONCLUSION

Accordingly, the Motion is **DENIED**. Defendant is precluded from arguing that the hypothetical negotiation date is earlier than July 14, 2015 on the basis argued herein.

**SIGNED this 27th day of March, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE